**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA**

Case Number: CIV-23-63-D

**ALLEN R. BRADLEY,**

**Plaintiff,**

**v.**

**JOHN KEVIN STITT, Governor,
State of Oklahoma,**

**Defendant.**

**CIVIL COMPLAINT SEEKING DECLARATORY JUDGMENT
AND REQUEST FOR INJUNCTIVE RELIEF**

**DEBRA K. HAMPTON, OBA # 13621**
Hampton Law Office, PLLC
3126 S. Blvd., # 304
Edmond, OK 73013
Tel:(405) 250-0966
Fax:(866) 251-4898
hamptonlaw@cox.net
Attorney for Plaintiff

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES.................................................................................................v

CASES..............................................................................................................................v

STATUTES .....................................................................................................................vi

UNITED STATES CODE................................................................................................vi

OTHER AUTHORITIES ................................................................................................vi

RULES.............................................................................................................................vi

OKLAHOMA DEPARTMENT OF CORRECTIONS (ODOC) POLICY .......................vi

A. PARTIES .....................................................................................................................1

B. JURISDICTION AND VENUE ...................................................................................2

C. INTRODUCTORY STATEMENT ...............................................................................2

D. EXHAUSTION OF REMEDIES .................................................................................3

E. GROUNDS: ..................................................................................................................4

    I.   OKLAHOMA'S SEX OFFENDER REGISTRATION IS UNCONSTITUTIONAL AND SHOULD BE DETERMINED TO VIOLATE THE UNITED STATES CONSTITUTION. ...................................4

ARGUMENT AND AUTHORITY .....................................................................................4

    a.   HISTORY OF THE OKLAHOMA SORA ............................................4

    b.   SORA DOES NOT PROMOTE PUBLIC SAFETY ...........................6

        i.   SORA is Counterproductive Because it is Likely to Increase Rather than Decrease Sexual Offending. ...............................................................6

        ii.   SORA 2021 Misidentifies the Source of the Risk for Sexual Offending. ..........9

        iii.   SORA Undermines Successful Reentry. .......................................10

        iv.   SORA Onerous Registration Requirements Serve No Legitimate Public Safety Purpose. ...............................................................11

ii

c.     SORA 2021 SUBJECTS PEOPLE TO REGISTRATION WITH NO INDIVIDUALIZED REVIEW, EVEN THOUGH MANY HAVE A LOWER-RISK OF SEXUAL OFFENDING THAN UNREGISTERED PEOPLE ...................................................................................... 12

    i.     The Average Recidivism Rate of People with Past Sex Offenses Is Low ...... 12

    ii.     Comparing the Likelihood that Registrants Versus Non-Registrants Will Reoffend ......................................................................... 13

    iii.     The Likelihood of Reoffending Varies Greatly Among People with Past Sex Offenses .................................................................. 14

    iv.     The Likelihood of Reoffending Drops Dramatically Over Time. ................... 16

    v.     Empirically Validated Individualized Risk Assessment Tools are Much More Effective Than Basing a Determination Merely on the Offense of Conviction ............................................................. 20

    vi.     SORA Conviction-Based Registration Requirements and Conviction-Based Tier ................................................................. 21

    vii.     The Vast Majority of Class Members Will Never Reoffend, and Thousands of People Who are Subject to SORA 2021 are Less Likely to Commit a Sex Offense Than People Who are Not Subject to Registration. ...................................................................... 24

d.     THE DIGITAL AGE HAS FUNDAMENTALLY CHANGED THE CONSEQUENCES OF BEING SUBJECTED TO SEX OFFENDER REGISTRATION. ....................................................................... 26

    i.     The Impact of Sex Offender Registration Today is Entirely Different from What it Was Two Decades Ago ......................................... 28

    ii.     The Ubiquity of Registry Information on the Internet Causes Registrants to Live in Fear and to Avoid the Internet, with Damaging Consequencesto Reentry ................................................ 30

    iii.     SORA Imposes Devastating Burdens on the Named Plaintiff and Others Similarly Situated. ........................................................ 31

e.     SORA IS VERY EXPENSIVE, HAS UNINTENDED CONSEQUENCES, AND DIVERTS RESOURCES FROM INTERVENTIONS THAT ACTUALLY WORK. ..................................................................... 35

f. THE BRANDED-IDENTIFICATION REQUIREMENT IS COMPELLED SPEECH AND DOES NOT SURVIVE STRICT SCRUTINY. ...................................................................................... 36

F.    REQUEST FOR RELIEF ........................................................................... 42

# TABLE OF AUTHORITIES

**CASES**

*Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 244 (2002) ...................................................37

*Atl. J. & Const. v. City of Atl. Dep't of Aviation*, 322 F.3d 1298, 1310 (11th Cir. 2003) ..41

*Axson-Flynn v. Johnson*, 356 F.3d 1277, 1284 n.4 (10th Cir. 2004) ................................37

*Barrios v. Haskell County Public Facilities Authority*, 2018 OK 90, 432 P.3d 233 ..........3

*Bell v. City of Winter Park*, 745 F.3d 1318, 1324 (11th Cir. 2014) ...................................41

*Cate v. Oldham*, 707 F.2d 1176, 1189 (11th Cir. 1983)....................................................41

*Doe v. Harris*, 772 F.3d 563, 572 (9th Cir. 2014)................................................................37

*Doe v. Shurtleff*, 628 F.3d 1217, 1223 (10th Cir. 2010)....................................................39

*Duckett v. Oklahoma ex rel. Bd. of Regents of Univ. of Okla.*,
    986 F.Supp.2d 1249, 1258 (W.D. Okla. 2013)................................................................3

*Freeman v. Henry*, 2010 OK CIV APP 134, 245 P.3d 1258...............................................4

*Kennedy v. Mendoza-Martinez*, 372 U.S. 144 (1963)..........................................................4

*Lamont v. Postmaster Gen.*, 381 U.S. 301, 307 (1965)......................................................38

*Packingham v. North Carolina*, 137 S.Ct. 1730, 1735 (2017)..........................................29

*Reimers v. State ex rel. Dept. of Corrections*, 2011 OK CIV APP 83, 257 P.3d 16...........4

*Reno v. ACLU*, 521 U.S. 844, 870 (1997) ..........................................................................38

*Smith v. Doe*, 538 U.S. 84, 99 (2003).................................................................................27

*Sorrell v. IMS Health, Inc.,* 564 U.S. 552, 565-66 (2011) .................................................38

*Starkey v. Oklahoma Dept. of Corrections*, 2013 OK 43, ¶ 79, 305 P.3d 1004, 1030........4

*Tiemann v. Tul-Center, Inc.*, 18 F.3d 851 (10th Cir. 1994)..................................................3

*United States v. O'Brien*, 391 U.S. 367, 377 (1968) ..........................................................39

*United States v. Playboy Entm't Grp.*, 529 U.S. 803, 812 (2000) ....................................38

*Virginia v. Hicks,* 539 U.S. 113, 119 (2003) ......................................................................41

*White v. Baker*, 696 F.Supp.2d 1289, 1309 (N.D. Ga. 2010) ........................................... 40

*Wooley v. Maynard*, 430 U.S. 705, 714 (1977) .................................................................. 36

## STATUTES

57 O.S. § 581 ........................................................................................................................6
57 O.S. § 583(C) ...................................................................................................................3
57 O.S. § 583(D) ...................................................................................................................3

## UNITED STATES CODE

28 U.S.C. §§ 1331 and 1343 ................................................................................................ 1
28 U.S.C. § 1391 .................................................................................................................. 2
28 U.S.C. §§ 2201 - 2202 .................................................................................................... 2
42 U.S.C. § 1983 ................................................................................................................. 1

## OTHER AUTHORITIES

Ira Ellman, When Animus Matters and Sex Crime Underreporting Does Not:
The Problematic Sex Offender Registry, 7 U. Pa. J. L. & Pub. Affs. 1, 19 (2021) .......... 10

## RULES

Fed. R. Civ. P. 57 and 65 ..................................................................................................... 2

## OKLAHOMA DEPARTMENT OF CORRECTIONS (ODOC) POLICY

OP-020307(I)(C)(4)(a)(2) ..................................................................................................... 2
OP-020307(I)(A) ................................................................................................................ 22

## EXHIBITS

1.   Dr. Karl Hanson Expert Report .................................................................................passim
2.   Dr. Elizabeth Letourneau Expert Report ...................................................................passim
3.   Dr. J.J. Prescott Expert Report ..................................................................................passim
4.   Dr. Kelly Socia Expert Report ...................................................................................passim
5.   Dr. Kristen Zgoba Expert Report ...............................................................................passim
6.   Dr. John Ulrich Expert Report ...................................................................................passim
7.   Sarah Lageson Expert Report ............................................................................................7
8.   Barbara Levine Expert Report ..................................................................................... 7, 21
9.   Richard Stapleton Expert Report ...............................................................................passim

**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| (1) | ALLEN R. BRADLEY, | ) |
| | Plaintiff, | ) |
| | | ) |
| v. | | ) |
| | | ) |
| (1) | JOHN KEVIN STITT, | ) |
| | Governor, State of Oklahoma, | )   JURY DEMAND |
| | Defendant. | ) |

**CIVIL COMPLAINT AND REQUEST FOR INJUNCTIVE RELIEF**

COMES NOW, the Plaintiff, ALLEN R. BRADLEY, through his attorney Debra K. Hampton and submits this as Plaintiff's Civil Rights Complaint under 42 U.S.C. § 1983. In support of it, Plaintiff states:

**A.     PARTIES**

**PLAINFIFF**

1.     **Plaintiff: ALLEN R. BRADLEY**, a United States citizen seeks relief in this Court because his constitutional rights have been violated and there is no other court of competent jurisdiction to address his claims.

**DEFENDANT**

2.     **Defendant: JOHN KEVIN STITT**, Governor, State of Oklahoma in his official capacity is an arm of the State when the current allegations arose. The Defendant is a resident of the State of Oklahoma.

1

**B.    JURISDICTION AND VENUE**

1.    Jurisdiction is proper under 28 U.S.C. §§ 1331 and 1343 because Plaintiff seeks redress under 42 U.S.C. § 1983 for the deprivation of rights secured by the U.S. Constitution.

2.    Plaintiff's requests for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201–2202, by Fed. R. Civ. P. 57 and 65, and by the legal and equitable powers of this Court.

3.    Venue is proper pursuant to 28 U.S.C. § 1391.

**C.    INTRODUCTORY STATEMENT**

4.    In 2006, Plaintiff was convicted of Indecent exposure in Oklahoma County District Court Case No. CF-2006-7956. Plaintiff had to register under Oklahoma Sex Offender Registration Act ("SORA") for the convicted offense. At the time of Plaintiff's charge, SORA required sex offenders, other than habitual or aggravated sex offenders, to register for ten years after release from incarceration. *See* Oklahoma Department of Corrections (ODOC) Policy OP-020307(I)(C)(4)(a)(2).

5.    Plaintiff was not found to be nor considered a habitual or aggravated sex offender. Plaintiff was released from custody on the Indecent Exposure offense on November 3, 2014, after satisfying a 10-year term of imprisonment.

6.    On November 1, 2007, SORA was amended to create a three-tier sex offender risk level system.[1] SORA was amended to require the Department of Corrections

---

[1] HB 1760, 2007 Okla. Sess. Laws c. 261 (*eff.* November 1, 2007)

or a court to assign a numeric risk level to a person "who will be subject to the provisions of the Sex Offenders Registration Act." Title 57 O.S. Supp.2007, §§ 582.1-582.2. Section 583 was also amended to set the registration period for the three levels. It provided "a person [who] has been convicted or received probation within the State of Oklahoma ... shall be required to register" for 15 years if the person is a level 1 offender, 25 years for a level 2 offender, and for life if a person is a level 3 offender or classified as a habitual or aggravated sex offender. Title 57 O.S. Supp.2007, § 583(C) and (D). The Legislature passed an emergency measure 6 months later to require a risk assessment be made for offenders who enter the state. 2008 Okla. Sess. Laws c. 94, § 1 (emerg. April 29, 2008).

7.      Plaintiff is incarcerated for violating sex offender registration in Oklahoma County District Court Case No. CF-2021-3580. Plaintiff was also convicted for violating sex offender registration in Oklahoma County District Court Case No. CF-2019-2877 and CF-2017-3354.

#### D.      EXHAUSTION OF REMEDIES

8.      Plaintiff has no mechanism under state law to challenge his registration requirements in relation to the United States Constitution. *See Barrios v. Haskell County Public Facilities Authority*, 2018 OK 90, 432 P.3d 233 rejecting that an individual has a private cause of action for constitutional torts. *Barrios*, *supra*, ¶ 13, 432 P.3d 233, 239. "It is well settled that [a] § 1983 claim may be available, even though a state remedy is foreclosed…" *Id* at fn. 21. *Duckett v. Oklahoma ex rel. Bd. of Regents of Univ. of Okla.*, 986 F.Supp.2d 1249, 1258 (W.D. Okla. 2013); *Tiemann v. Tul-Center, Inc.*, 18 F.3d 851 (10th Cir. 1994). The State leaves any constitutional violation to the federal court by

3

erecting a statutory bar to anyone incarcerated bringing a civil action. However, the Oklahoma Supreme Court's decision in *Barrios* erects a bar to anyone bringing a constitutional tort as set out herein.

E.    **GROUNDS:**

I.    **OKLAHOMA'S SEX OFFENDER REGISTRATION IS UNCONSTITUTIONAL AND SHOULD BE DETERMINED TO VIOLATE THE UNITED STATES CONSTITUTION.**

**ARGUMENT AND AUTHORITY**

A.    **HISTORY OF THE OKLAHOMA SORA**

9.    After the enactment of SORA there has been a lot of litigation in the courts as to the constitutionality of registration requirements and the process. Due process in the Oklahoma Courts have not been even handed because the opinions are not consistent. *See Freeman v. Henry*, 2010 OK CIV APP 134, 245 P.3d 1258 (holding SORA represents a civil regulatory scheme which does not violate the ex post facto proscriptions of either the United States or Oklahoma Constitutions). Then in *Reimers v. State ex rel. Dept. of Corrections*, 2011 OK CIV APP 83, 257 P.3d 16 (finding Plaintiff was entitled to relief but not reaching the merit of the "ex post facto" claims).

10.    In *Starkey v. Oklahoma Dept. of Corrections*, 2013 OK 43, ¶ 79, 305 P.3d 1004, 1030 the Oklahoma Supreme Court found (the retroactive extension of its registration period violates the prohibition on ex post facto laws provided in Article 2, § 15 of the Oklahoma Constitution). One thing the Court determined in *Starkey, supra,* ¶ 77 that [o]ut of the seven factors discussed in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144 (1963),

4

five favor a punitive effect. The Court determined that it was not the number of factors that was important but the weight of these factors concluding that SORA's obligations have become increasingly broad and onerous. *Id.* The Court found clear proof that the effect of the retroactive application of SORA's registration is punitive and outweighs its non-punitive purpose. The Court also stated "[t]his is not to say that Oklahoma's SORA is unconstitutional on its face." *Starkey, supra,* ¶ 78.

11.     In *Starkey,* the Court's recognition that registration requirements were punitive was a substantive determination which supports the current challenge of SORA. More recently, in 2021 the South Carolina Supreme Court ruled last week that a law requiring sex offenders to register for life on a statewide list is unconstitutional, sending the policy back to the General Assembly for review. In its unanimous ruling[2], the court said that the state's "requirement that sex offenders must register for life without any opportunity for judicial review violates due process because it is arbitrary and cannot be deemed rationally related to the Legislature's stated purpose of protecting the public from those with a high-risk of reoffending."

12.     SORA cannot be deemed rationally related to the Legislature's stated purpose of protecting the public because it is arbitrary. An expert in the treatment of sex offenders, Dr. Richard Kishur, an Oklahoma City counselor who has worked with sex offenders for more than 30 years, said his biggest reservation was that the law categorized

---

[2] *Dennis J. Powell, Jr.*, Respondent, v. *Mark Keel*, Chief, State Law Enforcement Division et al, Appellants, Case No. 2019-001063, (Opinion No. 28033)

offenders by the crime they commit, not the risk they actually pose.[3] Dr. Kishur's opinion

follows the experts addressed herein.

### B. SORA DOES NOT PROMOTE PUBLIC SAFETY

#### i. SORA is Counterproductive Because it is Likely to Increase Rather than Decrease Sexual Offending.

13.     The avowed purpose of Oklahoma's SORA under 57 O.S. § 581 et seq is set

forth as follows:

> B. The Legislature finds that sex offenders who commit other predatory acts against children and persons who prey on others as a result of mental illness pose a high-risk of reoffending after release from custody. The Legislature further finds that the privacy interest of persons adjudicated guilty of these crimes is less important than the state's interest in public safety. The Legislature additionally finds that a system of registration will permit law enforcement officials to identify and alert the public when necessary for protecting public safety.

57 O.S. § 581 (B)

14.     The idea that SORA will promote public safety is based on the assumption

that sex offender registration will reduce recidivism by people with past convictions and

reduce the risk of sexual crime to the public. According to expert affidavits attached hereto

clarify that assumption is false. Experts have engaged in studies and there is a clear

scientific and academic consensus that sex offender registration and notification laws like

Oklahoma's do nothing to benefit public safety.

15.     Plaintiff has included expert reports filed in *Doe A v. Whitmer*, in the United

States District Court for the E.D. of Michigan, Case No. 2:22-cv-10209. As outlined in

---

[3] https://www.mercurynews.com/2012/10/04/many-states-fall-short-of-federal-sex-offender-law/

6

more detail in the declarations of these experts which include, Drs. Karl Hanson, Elizabeth Letourneau, J.J. Prescott, Kelly Socia, and Kristen Zgoba, (Exs. 1, 2, 3, 4, and 5), the research shows that public registries do not reduce the frequency of sexual offenses, may well increase recidivism, and at best have no impact on sexual recidivism.

16.    The statistics discussed herein apply to a national consensus regarding sex offender registration and numbers may vary merely because of the population of a state and demonstrate there is an immense cost to the state and to registrants for maintaining a registry that is punitive.

17.    Plaintiff also includes expert reports from Drs. John Ulrich, Dr. Sarah Lageson, Barbara Levine, Anne Yantus, (Exs. 6, 7, 8, and 9)

18.    Plaintiff also submits an expert report from Richard Stapleton J.D., (Ex. 9) former Administrator of the Michigan Department of Corrections Office (MDOC) of Legal Affairs.[4] In his report he discusses Michigan law, but his analysis follows Oklahoma law. The key conclusions of his report are:

> The MDOC uses actuarial assessment instruments to measure offender risk, and then uses evidence-based practices to narrowly tailor parole and probation conditions based on offender risk level and individual needs. The MDOC not only targets interventions to high-risk offenders, but also minimizes interventions to low-risk offenders, because research shows that intensive supervision of low-risk offenders is counterproductive. By contrast, the requirements of the SORA are applied indiscriminately to all registrants, regardless of risk level or individual circumstances.
>
> SORA undermines the MDOC's use of evidence-based correctional practices because it imposes virtually identical requirements on all registrants regardless of risk level; it requires extensive and potentially counterproductive interventions for low-risk offenders; and it significantly

---

[4] Formerly the Office of Policy and Hearings.

limits employment opportunities, access to housing, and family reunification, which are critical to offender success upon release, for all offenders.

SORA is both similar to and different from regular parole/probation supervision in that both systems require regular reporting, but (a) SORA requires more information to be reported in shorter time periods; (b) SORA automatically imposes restrictions that the MDOC (or probation offices) impose on parolees/probationers only on an individualized basis; (c) SORA requirements apply for a minimum of 15 years to life, with most registrants subject to SORA for life, while parole restrictions typically last two years and probation restrictions are typically similarly short and/or are individually tailored; (d) SORA requirements do not decrease over time and cannot be contested, whereas parole/ probation conditions are frequently relaxed during the course of supervision and can be challenged through MDOC grievance procedures; (e) a violation of SORA can result in a term of incarceration up to ten years, whereas the length of incarceration resulting from a violation of probation or parole is capped at the length of the underlying sentence (and is often relatively short), and (f) unlike probation and parole, SORA has no provision to work with victims or with registrants' family members (who often are victims as well), or with registrants' land-lords, employers, etc., to help registrants successfully reintegrate into society.

Parole and probation agents charged with supervising parolees/probationers who are also subject to sex offender registration have great difficulty interpreting and applying SORA because the statute is so vague. The interpretation of enforcing agencies has varied greatly from jurisdiction to jurisdiction.

These conclusions are addressed herein.

19. Virtually all relevant empirical research strongly undermines any argument that public registries combat recidivism. Such laws simply do not reduce sexual reoffending. Instead, the research overwhelming shows that, at best, public registration laws make no difference to recidivism rates, that they may well increase recidivism, and that they are counterproductive to their avowed purpose of public protection. Prescott Report, Ex.3, ¶¶ 1–37; Letourneau Report, Ex. 2, ¶¶ 6–11; Socia Report, Ex. 4, ¶¶ 5–8.

20. Although it may seem counterintuitive that public registration increases rather than decreases recidivism, these results reflect the fact that sex offender registration and the attendant consequences exacerbate risk factors for recidivism such as lack of employment and housing, prevent healthy reintegration into the community, and have deleterious impacts on registrants' mental health. *See* Prescott Report, Ex. 3, ¶¶ 1–37; Letourneau Report, Ex. 2, ¶¶ 15–16.

21. The evidence indicates that the recidivism-increasing effects of community notification laws at the very least offset and may overwhelm whatever public safety benefits such laws might offer (if any). Prescott Report, Ex. 3, ¶ 1.

22. Applied to Michigan, the research suggests that Michigan's registration statute contributes to sex offense rates in Michigan that are up to 5% higher than they would be without SORA 2021. The continued growth in the size of the public registry will likely result in even more additional sex offenses as more and more people are added to the registry. Existing evidence suggests that, far from reducing recidivism, SORA 2021 is actively increasing the total number of sex offenses each year in Michigan. Prescott Report, Ex. 3, ¶¶ 13, 15. But the same is true for Oklahoma and elsewhere.

### ii. SORA 2021 Misidentifies the Source of the Risk for Sexual Offending.

23. Most new sex offenses—90 to 95%—are committed not by registered offenders, but by people without prior sex offenses who are thus not listed on a sex offender registry. Socia Report, Ex. 4, ¶ 2.

9

24.     In addition, SORA 2021, by focusing on identifying strangers who might pose a danger, misidentifies where offending occurs. Most sex crimes are committed by acquaintances, family members, or other people who know the victim, rather than by strangers. Only 13 to 15% of sex crimes reported to the police are committed by strangers. Child-victim sex crimes are even less likely to involve strangers, who account for only 5 to 10% of such crimes. Socia Report, Ex. 4, ¶ 4; Prescott Report, Ex. 3, ¶ 32.

25.     The low proportion of sex crimes involving individuals on the registry—only 5 to 10%—combined with the low proportion of sex crimes involving strangers, helps explain why the research shows that sex offender registries are ineffective at reducing sexual offending or making communities safer. Socia Report, Ex. 4, ¶ 5. *See also* Ira Ellman, When Animus Matters and Sex Crime Underreporting Does Not: The Problematic Sex Offender Registry, 7 U. Pa. J. L. & Pub. Affs. 1, 19 (2021) ("One can't have much impact on the overall incidence of sexual offenses by concentrating efforts on a group that accounts for less than 5% of them.").

### iii.    SORA Undermines Successful Reentry.

26.     Not only do registration schemes fail to improve community safety, but they also undermine the ability of people with past sex offenses to successfully reintegrate into society. Letourneau Report, Ex. 2, ¶¶ 6, 15–16; Prescott Report, Ex. 3, ¶¶ 1, 34–51; Zgoba Report, Ex. 7, ¶¶ 22–30; Socia Report, Ex. 4, ¶¶ 8, 22–23.

27.     There is a scientific and academic consensus that people subjected to registration and notification requirements (like those imposed by SORA) have difficulty finding and maintaining stable housing, employment, and prosocial relationships.

10

Letourneau Report, Ex. 2, ¶¶ 6, 15–16; Socia Report, Ex. 4, ¶¶ 22–23; Zgoba Report, Ex. 7, ¶¶ 22–30.

28.     Stable housing, employment, and prosocial relationships are the three most important factors contributing to successful reentry and maintenance of a law–abiding lifestyle. Letourneau Report, Ex. 2, ¶¶ 6, 15.

29.     SORA imperils public safety by increasing the likelihood of job–lessness, homelessness, and disconnection from prosocial friends and family, which increases the likelihood of sexual and non-sexual recidivism. SORA 2021 thus sabotages its own avowed public safety goals. Letourneau Report, Ex. 2, ¶¶ 6, 15.

30.     The many burdens registrants face—the unstable housing and jobs, the public censure that creates a pariah class, and the difficulty of reintegrating into society as a result—help to explain why the research shows that public registries do not decrease recidivism, and if anything may increase recidivism by exacerbating the core risk factors known to contribute to reoffending. Prescott Report, Ex. 3, ¶ 1.

31.     The United States is one of the only countries in the world that publicizes sexual offender registry information. The great majority of other countries limit access or use of such information to law enforcement. Zgoba Report, Ex. 7, ¶¶ 44–46.

### iv.     SORA Onerous Registration Requirements Serve No Legitimate Public Safety Purpose.

32.     SORA requires reporting of a vast array of information, often in-person and within three business days, and in most cases for life. No empirical evidence supports the notion that more frequent registration check-ins lower recidivism, nor is there evidence

11

that reporting additional information (*e.g.,* email addresses, employment information) reduces recidivism. Failure to register or comply with other registration requirements does not correlate with sexual recidivism. Letourneau Report, Ex. 2, ¶¶ 19–21; Hanson Report, Ex. 1, ¶ 77; Socia Report, Ex. 4, ¶¶ 24–28; Zgoba Report, Ex. 7, ¶¶ 12–19.

33.    Even though law enforcement officials do not use the extensive information reported, and even though failures to report this information do not affect sexual re-offense rates, SORA's one-size-fits-all regime subjects all registrants to an intensive reporting regimen that requires them to update even trivial changes to information within three days.

34.    Data produced in Does I showed there were 14,884 prosecutions for SORA violations over a 15-year period from 1998 to 2012, averaging just under 1,000 per year. Data from 2010 to 2019 show an average of about 880 prosecutions per year (though this data set appears to under-report misdemeanor cases). Levine Report, Ex. 8, ¶¶ 11, 25-28.

**C.    SORA 2021 SUBJECTS PEOPLE TO REGISTRATION WITH NO INDIVIDUALIZED REVIEW, EVEN THOUGH MANY HAVE A LOWER-RISK OF SEXUAL OFFENDING THAN UNREGISTERED PEOPLE**

**i.    The Average Recidivism Rate of People with Past Sex Offenses Is Low**

35.    SORA retains most of the core provisions of the old SORA. It is a one-size-fits-all regime designed for the highest risk offenders, with no individualized assessment of current risk. It presumes that all those convicted of a sex offense pose the same high-risk to public safety—that they are all "a potential serious menace and danger,"—and that they will remain so for decades or for life.

36.     Even if that assumption were true, it would not justify the harsh restrictions imposed by SORA because, those restrictions undermine the law's stated purpose and reduce public safety (or do not affect it). The underlying assumption, however—that all people convicted of sex offenses present a serious and long-term public safety risk—is patently false.

37.     Modern social science research confirms that most people convicted of a sex offense are never convicted of a second such offense. Hanson Report, Ex. 1, ¶¶ 3b, 13–14, 18; Letourneau Report, Ex. 2, ¶¶ 6, 12; Socia Report, Ex. 4, ¶¶ 9–12. Nearly all methodologically rigorous research studies find that 80 to 90% of adult males with a past sex offense conviction are never convicted of a new sexual crime. Letourneau Report, Ex. 2, ¶ 12. Thus, the data does not support that a registry truly serves a legitimate public interest.

38.     The recidivism rate of individuals with past sex offense convictions is also much lower than the recidivism rate (to commit a new offense of the same type as the previous offense) of people convicted of virtually any other type of crime.[5]

ii.     **Comparing the Likelihood that Registrants Versus Non-Registrants Will Reoffend**

39.     For context, it is important to compare registrants' sexual recidivism rates with the likelihood of spontaneous, "out-of-the blue" sexual offending by people who have

---

[5] The recidivism rate for people with sex offenses is lower, and in most cases far lower, than for other categories of offenders (like people with assault, armed robbery, drug or property crime convictions). Only murderers have a lower recidivism rate. Socia Decl., Ex. 6, Finding #2; Hanson Decl., Ex. 3, ¶ 13.

no prior history of sexual offending. There are two logical comparison groups: (1) people who have committed non-sexual offenses; and (2) the general population of adult males. Neither group is placed on sex offender registries. Hanson Report, Ex. 1, ¶¶ 19, 73.

40.    The rate of first time out-of-the-blue sex offenses by individuals with criminal convictions for non-sex offenses (but no history of sexual offending) is equivalent to a 5-year sexual recidivism rate of 2%, and an estimated lifetime rate of 3.8%. Hanson Report, Ex. 1, ¶ 20.

41.    The rate of first time out-of-the-blue sex offenses by males in the general population equals a 5-year sexual recidivism rate of 1% and a lifetime rate of 2%. Hanson Report, Ex. 1, ¶ 22. Any claim that SORA is intended to serve a public protection function is undermined by it imposing registration on tens of thousands of people whose risk for sexual recidivism is not perceptibly higher than the baseline ambient risk presented by these two groups. Hanson Report, Ex. 1, ¶¶ 3f–g, 19, 24–25, 75.

### iii.    The Likelihood of Reoffending Varies Greatly Among People with Past Sex Offenses

42.    One reason that sex offender registration laws are so ineffective is that they do not accurately delineate the few people at higher risk to reoffend sexually from the large majority of people at lower risk to reoffend sexually. Letourneau Report, Ex. 2, ¶ 13.

43.    Recidivism rates are not uniform across all individuals with a past sex offense conviction but vary based on well-known factors. Hanson Report, Ex. 1, ¶¶ 3a, 15–17, 29, Table 1. Thus, while the average recidivism rates are low even for an undifferentiated group of people with past sex offenses, those rates still significantly

14

overstate the risk for lower-risk registrants by lumping them with people at a higher risk of reoffending.

44.    The risk for sexual offending is highly correlated with age. The highest rates of offending are observed during the late teens and early 20s, with progressive declines thereafter. There are very few individuals over the age of 60 who present any significant risk for sexual recidivism. Hanson Report, Ex. 1, ¶¶ 3c, 26.

45.    The most widely used risk assessment instrument for sexual offending, the Static-99/Static-99R, groups individuals into five levels: Level I–Very Low-Risk; Level II–Below Average Risk; Level III–Average Risk; Level IVa–Above Average Risk; and Level IVb–Well Above Average Risk. Hanson Report, Ex. 1, ¶¶ 31, 35–42.

46.    Level I identifies individuals with a history of sexual crime whose risk for a subsequent sexual offense does not differ from the rate of spontaneous out of the blue sexual offending for individuals with a criminal history but no previous sexual offenses. Out of 100 individuals at this risk level, 98 will never be convicted of another sexual offense, even with follow-up periods extended to 20 years. The risk of recidivism for Level I individuals is so low it would be practically impossible to lower it further. Hanson Report, Ex. 1, ¶¶ 39, 45.

47.    Level II describes individuals whose risk for sexual recidivism is slightly higher than the general population, but still very low (1.6% to 2.2% after five years). Most Level II individuals will move to Level I given short term (six to 12 months) community supervision and focused counseling. Hanson Report, Ex. 1, ¶ 40.

15

48.    Level III identifies individuals in the middle of the risk distribution for sexual recidivism. Out of 100 individuals classified as Level III, between three and seven will be expected to be reconvicted of a sexual offense within five years; conversely between 93 and 97 will remain sexual offense-free. Hanson Report, Ex. 1, ¶ 41.

49.    Individuals in the top two levels, Level IVa and IVb, are expected to have sexual recidivism rates of between 9% and 60% after five years. Hanson Report, Ex. 1, ¶ 42.

50.    At the time of release, most individuals with a sex offense history will be classified as Level III–average risk. Specifically, the distribution is as follows: Level I – 5.7%, Level II – 18.2%, Level III – 50.4%, Level IVa – 18.1% and Level IVb – 7.6%. Hanson Report, Ex. 1, ¶ 43.

51.    This distribution changes over time. After 10 to 15 years, most individuals will transition to Level I, and their risk will be at or below the baseline risk for non-sexual offenders and is so low that any further interventions have no public protection benefits. Hanson Report, Ex. 1, ¶ 45.

### iv.    The Likelihood of Reoffending Drops Dramatically Over Time.

52.    The risk that a person will reoffend drops significantly for each year that a person spends in the community offense-free, decreasing dramatically over time. The longer individuals remain offense-free in the community, the less likely they are to reoffend. Most recidivism occurs within three years of a previous arrest and almost always within five years. The decline in recidivism risk for individuals who remain offense-free

in the community is one of the most well-established findings in criminology. Hanson Report, Ex. 1, ¶¶ 47, 54.

53.    The recidivism risk of people with past sex offenses drops on average by approximately 50% for each five years they remained offense-free in the community. In other words, if their risk was 10% at time of release, it would drop to 5% after five years, and to 2.5% after ten years. These reductions are particularly evident for the highest risk group, if they remain offense-free in the community. Hanson Report, Ex. 1, ¶ 59.

54.    Individuals with a past sex offense conviction who are not arrested for a new sex offense will eventually become less likely to reoffend sexually than a non-registrant with a non-sex offense history is to commit an "out-of-the-blue" sex offense. Hanson Report, Ex. 1, ¶ 60.

55.    For methodological reasons and to improve accuracy, researchers have pegged the baseline rate to the rate of people who have been arrested for a non-sex offense but have no sex offenses. The rates of sexual offending in that group are in the 1 to 3% range within a five-year period. Researchers call this the "desistance" rate, which essentially measures when a person with a past sex offense conviction presents no more risk than someone who is not subject to sex offender registration requirements. Hanson Report, Ex. 1, ¶¶ 61, 64.

56.    How quickly someone with a sexual offense history reaches the desistance level depends on their risk level at the time of sentencing/release. The lowest risk individuals are below the baseline from the outset. Individuals from all risk levels

eventually cross the desistance threshold, meaning that their risk is below the baseline, as shown in the chart below. Hanson Report, Ex. 1, ¶¶ 3.f, 66–68.



57.    Most individuals, i.e., those in the middle of the risk distribution (Level III–average risk) crossed the desistance threshold after about ten years. Individuals classified at the highest risk levels (Level IVb – well above average risk) crossed the desistance threshold after about 20 years. Hanson Report, Ex. 1, ¶ 66.

58.    The risk for a new sexual offense has, for practical purposes, been extinguished after people remain in the community for 20 years without reoffending sexually. This is true even for those individuals classified at the very highest risk level at the time of release. Hanson Report, Ex. 1, ¶¶ 68–69. Research on recidivism also includes time-survival analysis. For example, a person's life expectancy at birth might be 82, but if the person lives to 82, the person may then have a life expectancy of 91. Most individuals,

*i.e.,* those in the middle of the risk distribution (Level III–average risk) crossed the desistance threshold after about ten years. Individuals classified at the highest risk levels (Level IVb–well above average risk) crossed the desistance threshold after about 20 years. Hanson Report, Ex. 1, ¶ 66.

59.     After ten years, most (57.1%) individuals with a sexual offense history will present no more risk than the general male population (2% lifetime). After 20 years offense-free, all will be classified as presenting no more risk than the general male population. Hanson Report, Ex. 1, ¶¶ 3.f, 73–74.

60.     Using the less stringent criteria of the sexual offending rate of individuals with a non-sexual criminal conviction (3.8% lifetime), 13.6% would be very low-risk at time of release. After five years almost 40% will be low-risk, and this proportion increases to almost three-quarters (74.3%) after ten years. After 15 years, only a small proportion (four out of 100) of individuals released from a sexual offense would present more risk of sexual offending than any of the other individuals with past criminal justice system involvement—people who are not subject to registration. Again, after 20 years, all will be classified as presenting no more risk than non-registrants with a non-sex conviction. Hanson Report, Ex. 1, ¶ 74.

61.     Because recidivism risk declines so significantly with time spent offense-free in the community, as well as with advancing age, requiring registration for extended periods, much less for life, serves no public safety purpose.

> **v.    Empirically Validated Individualized Risk Assessment Tools are Much More Effective Than Basing a Determination Merely on the Offense of Conviction.**

62.     States use a wide variety of methods to decide who will be on the registry, for how long, what their reporting requirements will be, and whether their information will be available to the public online. Some states, unlike Michigan, use risk assessments, rather than the offense of conviction, to determine a person's registry classification. Zgoba Report, Ex. 7, ¶¶ 39–43, 46. However, Oklahoma's sex offender risk assessment tool is strictly offense-based which offends constitutional principles because an assessment which is merely offense-based is not a true risk assessment.

63.     Actuarial risk assessment instruments—which are used to determine the statistical likelihood that an individual will reoffend based on known diagnostic indicators—are far better at predicting recidivism risk than the fact of a conviction. Hanson Report, Ex. 1, ¶¶ 27–32; Zgoba Report, Ex. 7, ¶¶ 36–37. Thus, another point that leaves Oklahoma's SORA unconstitutional.

64.     The risk for sexual recidivism at the time of release can be reliably predicted by widely used risk assessment tools, such as the Static-99R, which are used to assess the recidivism risk level of males who have committed sex offenses. Hanson Report, Ex. 1, ¶¶ 3e, 29–32.

65.     The Static-99R, and its predecessor, the Static-99, are the most widely used and well-researched sex offense risk assessment instruments in the world. It is the risk prediction tool of choice for the MDOC and is also used by other correctional entities in assessing parole suitability. Hanson Report, Ex. 1, ¶¶ 31–32; Ulrich Report, Ex. 6, ¶ 11.

20

66.     Factors considered in a Static-99R assessment include the nature of the sex-related offense or offenses that led to the most recent arrest (the "index offense"), demographics (age at release, relationship history), sexual criminal history (prior sexual offenses, any male victims, any unrelated victims, any stranger victims, any non-contact sexual offenses), and general criminal history (prior sentencing dates, non-sexual violence committed along with the index offense, prior non- sexual violence). *See* Hanson Report, Ex. 1, ¶ 30.

67.     The Static 99-R is designed to measure re-offense risk at the time of sentencing or release. Risk levels are not static, however, and drop dramatically over time, so when assessing present risk levels, the results of a Static-99/99R assessment must be analyzed in conjunction with the amount of time offense-free in the community. Therefore, a "Time Free in the Community Calculator" is used to adjust the initial Static 99/99R score to the present risk level. See Hanson Report, Ex. 1, ¶¶ 3f, 55–72; Ulrich Report, Ex. 6, ¶ 16.

68.     Using empirically validated risk tools like the Static-99R, decision-makers can identify registrants who pose no more risk of recidivism than do people never arrested for a sex-related offense but have been arrested for some other crime, or whose risk has fallen below that of males in the general population. Hanson Report, Ex. 1, ¶¶ 29–75.

### vi.   SORA Conviction-Based Registration Requirements and Conviction-Based Tier

69.     SORA mandates that people convicted of listed offenses register as sex offenders. The requirement to register is based solely on the offense of conviction, with no

21

determination of risk. See 57 O.S. § 582.5; *See also* OP-020307(I)(A) and (B)[6], Designation Criteria for Sex Offender Level Assignment.

70.    The law imposes registration regardless of whether the registrant presents any risk to anyone and with no attempt to use risk assessment instruments that are both cost effective and much more accurate than the offense of conviction at predicting risk. Prescott Report, Ex. 3, at 2.

71.    Except for a few Tier I and juvenile registrants, SORA contains no mechanism that would allow people to be removed from the registry based on a showing they do not present a risk to the community. SORA extensive obligations, including in-person reporting, remain in force regardless of how long the person has lived successfully in the community. The level of supervision and reporting, and the restrictions the law imposes, do not decrease over time.

72.    A person's tier assignment is also determined by the conviction (and sometimes the age of the victim or age difference between the registrant and the victim). OP-020307(I)(A) et seq. Tier classifications are not based on, and do not correspond to, a registrant's actual risk of reoffending or the danger any registrant poses to the public. *Id.*

73.    A registrant's tier classification determines the length of time that a person must register and the frequency of reporting. Tier I registrants must register and comply with all obligations imposed by SORA for 15 years; Tier II registrants must register and comply for 25 years; and Tier III registrants must register and comply for life.

---

[6] Effective Date: 03/17/2022

74. Thus, whether an individual is listed on the public registry, how long an individual must register, and how often an individual must report, are all also based solely on the offense of conviction, with no assessment or consideration of actual risk.

75. The nature of the sexual offense conviction (the name of the offense or criminal Code §), however, is unrelated to the risk of recidivism. Hanson Report, Ex. 1, ¶¶ 3d, 27–28. Although there are differences in the moral seriousness of sexual crimes and the level of punishments that society deems appropriate, the seriousness of the offense is largely unrelated to the likelihood of recidivism. In fact, people who have committed more intrusive sexual offenses are, if anything, less likely to reoffend than people who have committed non-contact sexual offenses. *Id.* at., ¶ 27. There are also no reliable differences in recidivism rates based on whether the victim was a child (12 or under), youth (13 to 17), or adult (18+). *Id.* at., ¶ 27.

76. Although SORA largely uses perceived offense seriousness and the age of the victim as the basis for determining tier levels (which determine how long a person must report and the frequency of reporting), such offense-based levels have little relationship to the likelihood that a registrant will reoffend. Hanson Report, Ex. 1, ¶ 28; Zgoba Report, Ex. 7, ¶¶ 36–37.

77. Large scale empirical research has shown that the federal tier levels—which SORA adopts from the federal Sex Offender Registration and Notification Act (SORNA)—either do not correlate or correlate inversely with sexual reoffending. Not only does research show that tier levels do not correspond to the likelihood that a person will reoffend, but research shows that the tier levels are actually backwards: if anything, people

23

in a higher tier reoffend at rates lower than people in a lower tier. This is not surprising given that SORNA—derived tiering—as in Oklahoma/Michigan—is based on the offense of conviction, which does not affect recidivism risk. Letourneau Report, Ex. 2, ¶ 13; Hanson Report, Ex. 1, ¶ 28; Zgoba Report, Ex. 7, ¶¶ 36–38.

78.    In   sum,   Oklahoma/Michigan's   "one-size-fits-all"   conviction-based registration requirements and conviction-based tier structure bear no rational relationship to the actual risk that individual registrants might pose to the community.

> **vii.    The Vast Majority of Class Members Will Never Reoffend, and Thousands of People Who are Subject to SORA 2021 are Less Likely to Commit a Sex Offense Than People Who are Not Subject to Registration.**

79.    Most of Oklahoma's registrants will not recidivate. This is true for several reasons. First, most people convicted of sexual offenses do not recidivate. Second, as also discussed above, people convicted of sexual offenses are a heterogeneous group whose risk level varies. Third, there are thousands of people, and possibly tens of thousands of people, subject to SORA who have lived offense-free in the community for ten years, or for decades.

80.    In Michigan data was introduced in litigation which showed there were almost 26,000 registrants in January 2001 (20 years ago), over 38,000 registrants in January 2006 (15 years ago), and about 47,000 registrants in January 2011 (10 years ago). *See* Does I, No. 12-cv-11194,[7] Total Number on SOR By Year, ECF # 92-3. Today that total is closer to 55,000 people. Levine Report, Ex. 8, ¶ 15.

---

[7] United States District Court, E.D. Michigan

81.    Data generated by SafeHome.org[8] indicate a total of 767,023 people were listed on state sex offender registries as of April 2022.

82.    Texas has the highest number of registered sex offenders, followed by California. But on a population-adjusted basis, Oregon and Montana have the highest rates in the nation. New Jersey has the nation's lowest population-adjusted rate of registered sex offenders.

83.    Alaska has by far the highest population-adjusted rate of rape (155 cases per 100,000 residents), and Arkansas has the nation's highest rate of child sexual abuse reports (254 cases per 100,000 children).

84.    Even in Oklahoma, a large proportion of registrants have been on the registry for at least ten years. If they were released and have not reoffended for ten years, most such registrants' risk drops below the risk of other unregistered males in the general population. For registrants who were released and have not reoffended for 20 years or more, all will have a risk lower than other unregistered males. Hanson Report, Ex. 1, ¶ 75.

85.    While some of these registrants will have been incarcerated for part or even all of that time, and some may have reoffended, the data suggests there are likely thousands, and possibly tens of thousands, of registrants who have reached desistance—where it makes no sense to keep them on a registry once they pose the same or less risk of committing a sexual offense than unregistered males in the population.

---

[8] https://www.safehome.org/data/registered-sex-offender-stats/

86.    There are also a significant number of registrants who are 60 years or older, a point after which the risk for reoffending is minimal. Hanson Report, Ex. 1, ¶¶ 3.c, 26.

87.    The longer Oklahoma's registry continues in its current form, the greater the percentage will be of individuals subjected to registration even though their risk level is at or below that of comparable unregistered groups thus making the registry arbitrary. This is because SORA imposes extremely long registration terms.

88.    In Michigan, about 73% of registrants (more than 39,000 people) are classified as Tier III registrants and subject to lifetime registration; 20% (over 10,000 people) are on the registry for 25 years as Tier II; and only 6.5% (almost 3,500 people) are on the registry for 15 years as Tier I. Levine Report, Ex. 8, ¶¶ 8, 16.b.

89.    There are thousands, and possibly tens of thousands, of people subjected to sex offender registration in Michigan who—given their initial risk classification and time offense-free in the community—are no more likely to commit a sexual offense than the general population of adult males in Michigan. Hanson Report, Ex. 1, ¶ 75. Keeping thousands of very low-risk individuals on the registry serves no public safety purpose. *Id.*

**D.    THE DIGITAL AGE HAS FUNDAMENTALLY CHANGED THE CONSEQUENCES OF BEING SUBJECTED TO SEX OFFENDER REGISTRATION.**

90.     Two decades ago, the U.S. Supreme Court described an early version of an internet sex offender registry as "analogous to a visit to an official archive of criminal records," *Smith v. Doe*, 538 U.S. 84, 99 (2003). In the nearly two decades since, technology has dramatically changed the form, function, and reach of registry information. Lageson Report, Ex. 7, ¶ 11.

26

91.     The architecture and user functions available on the Oklahoma registry are like that in the State of Michigan and elsewhere. The registry encourages browsing, mapping, and tracking registrants, rather than accessing targeted archival information. The design, language, and functionality of the registry website represent each person listed as a current danger to society, even if the person presents such a risk and even though the registry lacks individualized review. Lageson Report, Ex. 7, ¶¶ 12–13.

92.     The registry is designed to allow users to browse a list of registrants, rather than requiring a targeted name or address search. Internet users need not search for information about specific individuals or locations to have information provided to them that a neighbor or colleague is on the registry. Lageson Report, Ex. 7, ¶¶ 29–32.

93.     An internet user who searches a specific address, city, county, or zip code will pull up an interactive map of the location of all registrants within a specified radius, and need only click on the small black registrant icons to pull up the photo and all the registry details on each person in the area, as shown in the image below. Lageson Report, Ex. 7, ¶ 30. The public can also search by zip code, city, or county. Such a search will pull up a list of registrants, showing their photos, compliance status, name, address, and age, with a clickable link to take the user directly to the registrant's individual page. Each registrant's "home page" contains a photo, along with extensive, stigmatizing information about them, and has clickable links to numerous other pages with further information, as shown in the image below.

**≡  Oklahoma Sex Offender Registry**

## Search

| Search Type | Map | | |
|---|---|---|---|
| ○ BASIC SEARCH | Street | | ? |
| ○ APPEARANCE SEARCH | City | | ? |
| ○ OFFENSE SEARCH | State | Oklahoma ⌄ | ? |
| ● MAP SEARCH | | Oklahoma, Texas, Kansas, Arkansas, Missouri, New Mexico, No State | |
| | County | ⌄ | ? |
| | Zip Code | | ? |
| | Radius in Miles | 1 ⌄ | ? |
| | Search | Clear | |

94.    The registry is unlike other forms of state public criminal records, which require a targeted search of a specific person; do not allow for browsing of lists of convicted persons; do not include mapping, tracking, or alert capabilities; and do not present up-to-date personal information. The interface, interactivity, format, and text of the registry website are unlike a criminal records archive: the registry does not simply provide historical conviction information, but displays registrants as presently dangerous. Lageson Report, Ex. 7, ¶¶ 33–45. Again, Michigan and Oklahoma's registry system is almost identical.

                i.    **The Impact of Sex Offender Registration Today is Entirely Different from What it Was Two Decades Ago**

95.    When *Smith* was decided in 2003, the internet was a vastly different tool than it is today. Only 15% of Americans had broadband internet in their homes; only 3% got most of their information about the September 11th attacks from the internet; and only 6%

28

said they would have a hard time given up their wireless devices. Lageson Report, Ex. 7, ¶¶ 46–47.

96.    Today, the internet is the new public square, and the primary location for economic, social, political, and commercial exchanges. *See Packingham v. North Carolina*, 137 S.Ct. 1730, 1735 (2017) ("While in the past there may have been difficulty in identifying the most important places (in a spatial sense) for the exchange of views, today the answer is clear. It is cyberspace—the vast democratic forums of the internet in general, and social media in particular" (internal quotation marks and citations omitted)). The Court recognized North Carolina statute impermissibly restricts lawful speech in violation of the First Amendment. *Packingham, supra,* at 1731.

97.    People's registry status has become digitally linked to their names and is retrievable via basic internet searches—indeed it is often the first thing that will show up on a search of a person's name on Google. Search engine optimization has increased public access to registrants' personal information because internet search engine algorithms prioritize that information. Lageson Report, Ex. 7, ¶¶ 22, 64–69.

98.    Oklahoma's disclosures of data do not differ from Michigan that allow for the monitoring of registrants are re-disseminated across the internet, as they are cataloged, indexed, sold, and shared by third parties. Today, registry information is routinely scraped, copied, aggregated, and re-posted to private websites. Unlike the earlier schemes that required users to conduct a targeted search for specific registrants on a government–run website, registrants' personal information is now "harvested" to drive web traffic to specific websites and to increase "clicks" through posting registrant information on, for

29

example, real estate and other public records websites. Lageson Report, Ex. 7, ¶¶ 15–16, 22.

99.    Changes in internet infrastructure and database technology over the nearly two decades since *Smith, supra,* have transformed registry information from a government-run source that a user had to intentionally access, into a large scale, private-sector data commodity duplicated, aggregated, and pushed to innumerable internet users who passively receive registrant information without even intending to access it. Lageson Report, Ex. 7, ¶¶ 50–62.

### ii.    The Ubiquity of Registry Information on the Internet Causes Registrants to Live in Fear and to Avoid the Internet, with Damaging Consequences to Reentry

100.    When a person's registry status "pops up" on the internet, the consequences can be devastating, impacting employment, housing, education, and involvement in civic, religious, social, and family life. Easy access to registry information also results in registrants becoming the targets of on-and off-line vigilantism. Lageson Report, Ex. 7, ¶¶ 74–95. The ubiquity of registry information on the internet leads registrants to purposefully avoid digital and institutional spaces that rely on the internet, which in today's world, is central to public and private life. Registrants' opting out of institutional and social life through "digital avoidance" has consequences for recidivism and public safety, because it makes it more difficult for registrants to access the basic necessities shown to prevent crime, such as safe and stable housing, employment, and community relationships. Lageson Report, Ex. 7, ¶¶ 17–18. The consequences of digital labeling through the format

of the Oklahoma/Michigan registry and the attendant dissemination of registry information on private websites ultimately undermines public safety by making pariahs of registrants, effectively cutting them out of social, institutional, and technological life. Lageson Report, Ex. 7, ¶ 19.

101.    Plaintiff and a class of offenders live in fear that anyone who Googles their names will discover that they are on the registry, and that they will lose their jobs, housing, educational opportunities, or relationships. This fear leads Plaintiff and a class to curtail their online presence, often restricting their use to a close circle of friends and family who already know about their criminal history.

### iii.    SORA Imposes Devastating Burdens on the Named Plaintiff and Others Similarly Situated Which Include:

a.    Compelled Speech

b.    Ongoing Reporting, Surveillance, and Supervision

c.    Limitations on Access to Housing

d.    Limitations on Access to Employment

e.    Limitations on Access to Education

f.    Limitations on Travel

g.    Limitations on Speech and Use of the internet

h.    Public Stigmatization, False Information, and Social Engagement

i.    Criminal Enforcement of SORA

j.    Vagueness

102. SORA imposes a vast array of obligations, disabilities, and restraints that govern every aspect of Plaintiff's life and the lives of a class of offenders. SORA 2021 compels Plaintiffs to continually provide a great deal of information about themselves to law enforcement, much of which must be reported in-person and/or within three days—a burden that for most registrants lasts for life. SORA subjects Plaintiffs to continuous surveillance and supervision, and stigmatizes them as dangerous without any individualized assessment which leaves the registry solely arbitrary. In addition, SORA severely limits a registrant's ability to find housing and employment; to get an education; to travel; to engage in free speech, including use of the internet; to be free from harassment and stigma; and to understand what is required of them under the statute.

103. Finally, registration under SORA triggers a vast array of additional obligations, disabilities, and restraints under federal, state, and local laws (as well as private policies barring or limiting registrants from access to goods or services available to the public), all with no individualized assessment or showing either that registrants pose a danger or that the restrictions make communities safer. The fact data supports the registration requirements do not promote public safety it can no longer be assumed that registration requirements serve a legitimate state interest.

104. Registrants are compelled under threat of criminal prosecution to provide extensive information to the state, including:

    a.    Legal name and any aliases, nicknames, ethnic or tribal names, or other names by which the individual is or has been known.

    b.    Social Security number and any Social Security numbers or alleged Social Security numbers previously used.

c.      Date of birth and any alleged dates of birth previously used.

d.      The address where the individual resides or will reside.

e.      The name and address of any place of temporary lodging used or to be used during any period in which the individual is away, or is expected to be away, from his or her residence for more than 7 days, including the dates when the temporary lodging is used or to be used.

f.      The name and address of each employer, including any individual who has agreed to hire or contract for the individual's services.

g.      The general areas where the individual works and the normal travel routes taken by the individual in the course of his or her employment if the individual lacks a fixed employment location.

h.      The name and address of any school being attended, or any school that has accepted the individual as a student that he or she plans to attend.

i.      All telephone numbers, including but not limited to residential, work and mobile phone numbers, registered to or used by the individual.

j.      All electronic email addresses registered to or used by the individual, if the individual was required to be registered after July 1, 2011.

k.      All internet identifiers, meaning all designations used for self-identification or routing in internet communications or posting, registered to or used by the individual, if the individual was required to be registered after July 1, 2011.

l.      The license plate number and description of any vehicle owned or operated by the individual.

m.      Driver's license number or state personal identification card number.

n.      A digital copy of the individual's passport and other immigration documents.

o.      Occupational and professional licensing information, including any license that authorizes the individual to engage in any occupation, profession, trade, or business.

33

p. Written documentation of employment status, contractual relationship, volunteer status, or student status when individual enrolls or discontinues enrollment at an institution of higher education.

q. A complete physical description of the individual.

105. Tier III registrants must report this information every three months; Tier II registrants must report it twice a year; and Tier I registrants must report it yearly.

106. SORA also requires registrants to provide a photograph, fingerprints, and palm prints. If registrants' appearance changes, they must update the photograph within seven days.

107. In addition to reporting in-person at regular intervals, registrants living in Oklahoma must report within three business days in-person, or in another manner prescribed by the ODOC, whenever certain information changes.

108. Registrants must report in-person within three days, either because the statute requires it or because the ODOC has required in-person reporting, whenever the registrant:

a. Changes or vacates his or her residence or domicile;

b. Changes his or her place of employment;

c. Discontinues employment;

d. Changes his or her name;

e. Enrolls as a student;

f. Discontinues enrollment as a student;

g. If, as part of his or her course of studies, the individual is present at any other location in Oklahoma or throughout the United States;

34

h.   If the individual discontinues his or her studies at any other location in Oklahoma or throughout the United States;

i.   Before the individual changes his or her domicile or residence to another state. The new state and, if known, the new address must be reported at the time of reporting.

109.   In addition, registrants living in Michigan must report within three days:

a.   Any intention to travel for more than seven days;

b.   Any change in vehicle information;

c.   Any change in telephone numbers registered to or used by the individuals.

**F.   SORA IS VERY EXPENSIVE, HAS UNINTENDED CONSEQUENCES, AND DIVERTS RESOURCES FROM INTERVENTIONS THAT ACTUALLY WORK.**

**SORA Costs Millions**

110.   SORA 2021 is expensive not only in Michigan but in every state that had to implement and maintain a registration system, wasting government resources that could be used to actually make communities safer and reduce sexual offending. Letourneau Decl., Ex. 4, ¶¶ 6, 17–18. Indeed, studies from different states have shown that expansive registries with no pathway off for most registrants cost millions of dollars each year in staffing, surveillance, equipment, and maintenance. Letourneau Decl., Ex. 4, ¶¶ 17–18.

111.   While there is no published study on the costs of registries, there are reasons to believe it is very high - given the size of the registry, the length of registration terms, and the frequency of the required reporting. Zgoba Decl., Ex. 7, ¶ 10.

35

112. A full accounting of the costs of SORA must await discovery. Estimates based on publicly available data, however, suggest that the costs could significantly exceed $12 million annually.

113. The Michigan State Police's Sex Offender Registration Unit, which is responsible for maintaining the registry and registry website and has a gross annual budget of $1 million. Levine Decl., Ex. 10, ¶¶ 13, 18. The Oklahoma Department of Corrections is responsible for maintaining the registry and registry website in Oklahoma which has a significant impact on the budget of the agency.

114. SORA costs far exceed SORNA-related grant funding. By July 2009, all states had to comply with SORNA or risk losing 10 percent of the state's allocated Byrne Grant money, which states generally use to enforce drug laws and support law enforcement. The projected cost to Oklahoma with implementation of SORNA in 2009 was $5,867,138. The State received $2,790,472 in Byrne money in 2006 which ten percent of that money was $279,047. SORA costs are not economical considering that SORA does not serve a legitimate public safety concern and merely invokes societal alarm. (emphasis added)

G. **THE BRANDED-IDENTIFICATION REQUIREMENT IS COMPELLED SPEECH AND DOES NOT SURVIVE STRICT SCRUTINY.**

115. In *Wooley v. Maynard*, 430 U.S. 705, 714 (1977), the Supreme Court affirmed that the First Amendment protects "both the right to speak freely and the right to refrain from speaking at all." The issue in *Wooley* was that New Hampshire printed its motto, "Live Free or Die," on most license plates. *Id.* at 707 & n.1. George Maynard

disagreed with that ideological message. The Court held that it was unconstitutional to force Maynard and others to use their cars to propagate the state's message. More specifically, New Hampshire's license plate law compelled speech, and the state had no compelling interest in doing so. *Id.* at 715-17.

116. Plaintiff relies on *Wooley* and its progeny to argue that printing on state-issued identification cards is unconstitutional. In *Doe A v. Whitmer*, the United States District Court for the E.D. of Michigan, Case No. 2:22-cv-10209, determined that "Plaintiffs are correct." Because "[t]he branded-ID requirement compels speech, and it is not the least restrictive means of advancing a compelling state interest." *Id.*

117. "The constitutional harm—and what the First Amendment prohibits—is being forced to speak rather than to remain silent," and that harm does not turn on whether speech is ideological, factual, or something else. *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1284 n.4 (10th Cir. 2004).

118. **The internet-use reporting requirements are facially overbroad**. "The Constitution gives significant protection from overbroad laws that chill speech within the First Amendment's vast and privileged sphere." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 244 (2002). Though a state may burden speech if it has a strong enough interest, it cannot overburden speech. ASORCNA's internet-use reporting requirements unduly chill protected speech, so they are unconstitutional.

119. **The internet-use reporting requirements burden free speech**. ASORCNA implicates the First Amendment because it requires "a narrow class of individuals to notify the government" within three business days of engaging certain online

37

activity. *Doe v. Harris*, 772 F.3d 563, 572 (9th Cir. 2014). The Act requires offenders to report every "email addresses or instant message address or identifiers used, including any designations or monikers used for self-identification in internet communications or postings other than those used exclusively in connection with a lawful commercial transaction." Ala. Code § 15-20A-7(a)(9). Offenders must also provide a list of "any and all internet service providers used by the sex offender." *Id.* § 15-20A-7(a)(18); *see Id.* § 15-20A-10(e)(1).

120.    These requirements burden an offender's "ability and willingness to speak on the internet." *Harris,* 772 F.3d at 572. The Act specifically refers to "self-identification in internet communications or postings." Ala. Code § 15-20A-7(a)(9) (emphasis added). It creates an "affirmative obligation" to report activity, *Lamont v. Postmaster Gen.*, 381 U.S. 301, 307 (1965), thus requiring offenders to weigh the benefits of speech against the burden of reporting it. It is no defense that the burden falls mainly on online speech. *Reno v. ACLU*, 521 U.S. 844, 870 (1997). Nor is a defense that the Act burdens rather than bans speech; "the distinction between laws burdening and laws banning speech is but a matter of degree." *Sorrell v. IMS Health, Inc.,* 564 U.S. 552, 565-66 (2011) (quoting *United States v. Playboy Entm't Grp.*, 529 U.S. 803, 812 (2000)) (cleaned up).

121.    **The Act is also far-reaching**. An offender must report to the police every time he connects to a Wi-Fi spot at a new McDonald's, every time he uses a new computer terminal at a public library, every time he borrows a smartphone to read the news online, and every time he anonymously comments on a news article. Every time he walks into a new coffee shop, he must determine whether opening his laptop is worth the hassle of

38

reporting. The Act is not limited to unlawful internet activity. To the contrary, "just as the Act burdens sending child pornography and soliciting sex with minors, it also burdens blogging about political topics and posting comments to online news articles." *Harris*, 772 F.3d at 573. Merely because a state seeking to limit what interaction a sex offender has with the public violates the Constitution.

122.    **The internet-use reporting requirements do not survive even intermediate scrutiny**. The State has a compelling interest in protecting its citizens from predators. *See* Ala. Code § 15-20A-2(4) ("The Legislature declares that its intent... is to assist law enforcement in carrying out their duties and, most importantly, to protect the public, especially children."); *Doe v. Shurtleff*, 628 F.3d 1217, 1223 (10th Cir. 2010) ("We have no doubt that the State ... has a compelling interest in investigating kidnapping and sex-related crimes."). To the State's credit, that interest is "unrelated to the suppression of free expression." *United States v. O'Brien*, 391 U.S. 367, 377 (1968). But the State has not shown that ASORCNA is narrowly tailored. Because the Act requires an affirmative act as a condition of First Amendment activity, applies broadly, gives wide discretion to law enforcement, threatens serious criminal penalties, and applies forever without regard to risk, it is not narrowly tailored.

123.    First, under ASORCNA, "anytime registrants want to communicate with a new identifier, they must assess whether the message they intend to communicate is worth the hassle of" immediately reporting the change to law enforcement. *Harris*, 772 F.3d at 582. This chills speech and deters expressive activity. *See Lamont*, 381 U.S. at 307. And inevitably, some offenders must report in-person if "required by [their] local law

enforcement agency." Ala. Code § 15-20A-10(e)(1). That makes reporting "not only psychologically chilling, but physically inconvenient." *Harris*, 772 F.3d at 582.

124.    Second, the Act applies to broad swaths of lawful speech. A state "may not suppress lawful speech as the means to suppress unlawful speech." *Ashcroft*, 535 U.S. at 255. But Alabama makes little effort to single out types of speech that raise safety concerns. The Act does have an exception for identifiers "used exclusively in connection with a lawful commercial transaction." Ala. Code § 15-20A-7(a)(9). That is a sensible exception. But why just commerce-related speech? As the Ninth Circuit observed when it struck down an internet-use reporting requirement, if "a sex offender establishes a username on a news outlet's website for purposes of posting comments to news articles, it is hard to imagine how speedily reporting that identifier will serve the government's interests." *Harris*, 772 F.3d at 582; *see also White v. Baker*, 696 F.Supp.2d 1289, 1309 (N.D. Ga. 2010) ("A regulatory scheme designed to further the state's legitimate interest in protecting children from communication enticing them into illegal sexual activity should consider how and where on the internet such communication occurs."). Perhaps the State could enact a "specific, narrowly tailored" law addressing "conduct that often presages a sexual crime, like contacting a minor or using a website to gather information about a minor." *Packingham v. North Carolina*, ___ U.S. ___, 137 S.Ct. 1730, 1737 (2017). The State did not do so here.

125.    Third, ASORCNA grants local law enforcement significant discretion. There is no objective limiting principle to prevent arbitrary or discriminatory enforcement. The sheriff of one county could require offenders to report in-person each time they create a

40

new online identifier, while the sheriff of a neighboring county could let offenders report such changes over the phone. Nothing keeps police officers from requiring one offender to report in-person while allowing others to report over the phone. The effect of this discretion is that offenders may fear retribution if they criticize the police online. That conflicts with the need for "stringent protection of First Amendment rights." *Cate v. Oldham*, 707 F.2d 1176, 1189 (11th Cir. 1983); *see also Bell v. City of Winter Park*, 745 F.3d 1318, 1324 (11th Cir. 2014) ("A grant of unrestrained discretion to an official responsible for monitoring and regulating First Amendment activities is facially unconstitutional") (quoting *Atl. J. & Const. v. City of Atl. Dep't of Aviation*, 322 F.3d 1298, 1310 (11th Cir. 2003) (en banc)).

126. Fourth, violating ASORCNA can lead to a felony conviction and years behind bars. This "may well cause speakers to remain silent rather than communicate." *Reno*, 521 U.S. at 872, 117 S.Ct. 2329; see *Harris*, 772 F.3d at 578 ("The concern that an overbroad statute deters protected speech is especially strong where, as here, the statute imposes criminal sanctions") (citing *Virginia v. Hicks*, 539 U.S. 113, 119 (2003)).

127. Failing to account for risk is a problem throughout ASORCNA. Not all sex crimes are the same. Nor are all offenders the same. Instead, as Dr. Karl Hanson explains one can classify sex offenders based on their risk of committing another sex offense ("sexual recidivism").

128. Some offenders have a low-risk of sexual recidivism; others have a medium or high-risk. Also, the older someone gets, and the longer he goes without committing a new crime, the less likely he is to reoffend. At a certain point, "most individuals convicted of a sexual offense will be no more likely to commit another sexual offense than the rate

41

of spontaneous 'out-of-the-blue' sexual offenses in the general population." Low-risk offenders cross that threshold upon release from prison. Medium-risk offenders cross it ten to fifteen years later. Even high-risk offenders, after twenty years offense-free, pose no more of a threat to the public than does the average man walking down the street. Because they chill a wide swath of protected speech under penalty of felony, ASORCNA's internet-use reporting requirements, Ala. Code §§ 15-20A-7(a)(9), (18), 15-20A-10(e)(1), are facially overbroad in violation of the First Amendment.

## H.    REQUEST FOR RELIEF

Wherefore, Plaintiff, ask the Court to grant the following relief:

A.   Rule that this action may be certified as a class action under Fed. R. Civ. P. Rule 23(b)(2).

B.   **Lack of Individualized Review:** Declare under 28 U.S.C. §§ 2201 and 2202, that SORA, by imposing extensive and in most cases lifetime sex offender registration with no individualized, periodic review, violates the Due Process and Equal Protection Clauses of the United States Constitution;

C.   **Unequal Opportunity to Petition for Removal:** Declare, pursuant to 28 U.S.C. §§ 2201 and 2202, that SORA is irrational and violates the Equal Protection Clause because it allows only certain registrants to petition for removal.

D.   **Mandatory Reporting Requirements and Compelled Speech**: Declare, pursuant to 28 U.S.C. §§ 2201 and 2202, that SORA's compelled disclosure requirements violate the First and Fourteenth Amendment rights of the named Plaintiff and those similarly situated because there is no individualized, periodic determination that (1) the person is presently dangerous, (2) compelled disclosure is necessary to alleviate that danger, and (3) the information is not otherwise available to law enforcement;

E.  **Reporting Requirements, Restricting Speech, and Association:** Declare, pursuant to 28 U.S.C. §§ 2201 and 2202, that SORA's provisions for reporting and making public registrants' information violates Plaintiff's freedom of speech protected under the First Amendment to the U.S. Constitution and violates the Fourteenth Amendment.

G.  Grant Plaintiff attorneys' fees and costs as permitted under 42 U.S.C. § 1988, and any other costs or expenses allowed by law.

H.  Grant such other relief as justice requires.

Respectfully submitted,

/s/ *DEBRA K. HAMPTON*
DEBRA K. HAMPTON, OBA # 13621
Hampton Law Office, PLLC
3126 S. Blvd., # 304
Edmond, OK 73013
(405) 250-0966
(866) 251-4898 (fax)
hamptonlaw@cox.net
Attorney for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of January 2023, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrant:

Office of the Attorney General
fhc.docket@oag.state.ok.us

/s/ *DEBRA K. HAMPTON*
DEBRA K. HAMPTON

43